Filed 8/10/26  Tumbleweed Tiny House Co. v. NBCUniversal Media CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| TUMBLEWEED TINY HOUSE CO., INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> NBCUNIVERSAL MEDIA, LLC, et al., <br><br> Defendants and Respondents. | B349399 <br><br> (Los Angeles County Super. Ct. No. 21STCV41185) |

APPEAL from an order of the Superior Court of Los Angeles County, Christopher K. Lui, Judge.  Affirmed.

Law Office of Dominic Surprenant and Dominic Surprenant for Plaintiffs and Appellants.

Latham & Watkins and Robert J. Ellison for Defendants and Respondents Marcus Lemonis, FreedomRoads Holding Co., LLC, and Camping World, Inc.

Gibson, Dunn & Crutcher, Ilissa Samplin, Marissa M. Mulligan, Matt A. Getz and Mckenzie R. Robinson for Defendant and Respondent NBCUniversal Media, LLC.

Davis Wright Tremaine, Jonathan L. Segal, Cristina Salvato, Zoë McKinney and Farrah C. Vazquez for Defendant and Respondent Machete Corporation.

―――――――――――

Tumbleweed Tiny House Co., Inc. (Tumbleweed), and its owner Steve Weissmann appeal from the trial court's order confirming an arbitration award in favor of respondents NBCUniversal Media, LLC, Machete Corporation, Marcus Lemonis, Camping World, Inc., and FreedomRoads Holding Co., LLC. Contrary to appellants' assertions, neither undue means nor bias prejudicially infected the arbitration award. We thus affirm the judgment.

## I.

Tumbleweed is Weissmann's tiny home manufacturing business. In 2016, Tumbleweed was in debt and losing money. At that time, Weissmann sought to have Tumbleweed appear on *The Profit*. *The Profit* was an unscripted television show on CNBC, an NBCUniversal subsidiary, and was a production of Machete Corporation. The show featured entrepreneur Marcus Lemonis. Lemonis would attempt to help the struggling small businesses appearing on the show become profitable. Lemonis would sometimes invest in those businesses. Weissmann had watched *The Profit* for years. He was impressed with Lemonis's track record of helping businesses, but was also aware that not every participating company fared well on the show.

*The Profit* decided to feature Tumbleweed. Weissmann, for himself and his company, signed participant agreements. The agreements described how the show would include a "simulated investment" to create a televised "dramatic moment." If Lemonis

2

were to really invest, this would occur after filming.  Tumbleweed agreed to assume the risk of relying on Lemonis's advice, and disavowed relying on "any promise, representation, or warranty" outside the agreements in deciding whether to appear on the show.

Filming lasted six non-consecutive days.  Tumbleweed then appeared on an initial episode and, later, on a look-back episode, which provided an update on the company but contained no previously unaired footage.

During filming of an hours-long simulated investment negotiation, Lemonis raised concerns with Tumbleweed's financials and Weissmann's financial practices.  Lemonis stated Weissmann was "on the hook criminally" and that Tumbleweed's liabilities could land him in jail.  Nonetheless, Lemonis and Weissmann discussed the framework for potential investment deals where Lemonis (or his companies, Camping World and FreedomRoads) would provide Tumbleweed access to $2.5 or $3 million for an equity stake in the company.  Later in the filming, Lemonis initiated an "all hands" meeting where he told Tumbleweed's employees that he agreed to invest $2.5 or $3 million, would be "100% in charge," and accused Weissmann of illegal practices, claiming $900,000 was gone.  None of the accusations of illegality or the threat of jail aired.

At the time of filming, Lemonis and Weissmann at times appeared committed to making a deal, though they acknowledged no deal had been reached.  After filming, no investment deal was set forth in writing.  Though no investment deal was memorialized, Lemonis's company, FreedomRoads, did loan Tumbleweed approximately $2.5 million both during and after the filming.

Tumbleweed struggled to repay those loans and filed for bankruptcy in 2020.

In 2021, Tumbleweed and Weissmann (together, the "claimants") sued respondents in California for, as now relevant, breach of fiduciary duty, fraud, fraudulent inducement, fraudulent concealment, and intentional infliction of emotional distress. Claimants alleged Lemonis falsely promised a $3 million deal while filming when he never intended to make such a deal, that claimants were fraudulently induced to appear on the show due to false statements about Lemonis's ability to help struggling companies become profitable, and that Weissmann experienced severe emotional distress from his fear that Lemonis's claims of criminality would appear on the televised episodes. FreedomRoads then sued Weissmann in Illinois for failing to repay its loans to Tumbleweed, which Weissmann had guaranteed.

The disputes were consolidated in an arbitration conducted by the Honorable Candace D. Cooper (Ret.) of JAMS. After a seven-day evidentiary hearing, the arbitrator issued extensive written findings and conclusions of law and ruled in favor of respondents.

First, ruled the arbitrator, respondents did not breach a fiduciary duty. Respondents owed claimants no such duty because Lemonis did not obtain control of Tumbleweed while Weissmann retained control "in every practical way." Weissmann himself had testified that he continued to run "Tumbleweed's business on a day-to-day basis and exercised unchecked discretion in managing sales, marketing, manufacturing, the production floor, and deciding which floor plans [for the tiny homes] would be offered." "Weissmann, not

4

Lemonis, unilaterally terminated two of the most senior managers at Tumbleweed, and at all times, Weissmann was Tumbleweed's CEO, sole board member, and sole shareholder." Lemonis's statement of being "100% in charge" to the employees was a "trademarked tag line that he ha[d] used on all episodes of *The Profit* for eight seasons," Lemonis repeatedly stated to Weissmann he was not in control, and Weissmann acknowledged Lemonis did not want to talk to him except on camera. Further, claimants had failed to show that any of the other respondents could have any responsibility for Lemonis's alleged breach of duty.

Second, claimants' fraud and fraudulent inducement claims failed for various reasons. Under the participant agreements, filmed simulations were illusory and nonbinding; claimants assumed the risk of relying on any of Lemonis's advice; and claimants waived reliance on "any promise, representation, or warranty" that appeared outside of the agreements. The arbitrator found no evidence of anything but fictional deals and no promise of a $3 million deal for equity. Also, an objectively prudent businessperson would have expected some sort of written document to memorialize an upcoming deal involving $3 million. There was ample evidence, moreover, that Weissmann knew there was no deal and that a deal, if it materialized, would "obvious[ly]" be in writing. There was no reasonable reliance. In addition, claimants had not shown any statement of Lemonis's prior successes was false or that Lemonis had engaged in intentional deceit. Weissmann had been aware that not every business featured on *The Profit* was saved.

Third, as to the fraudulent concealment claims, the arbitrator found claimants had not shown that respondents

5

concealed any material fact, that respondents intended to defraud, that claimants were unaware of any concealed material fact, that claimants would have acted differently had they known of any concealed material fact, that respondents had a duty to disclose running to claimants, or that claimants suffered damages.

Finally, the statute of limitations barred Weissmann's intentional infliction of emotional distress claim. Even so, the purported distress — having to reckon with the potential airing of Lemonis's claims of Weissmann's criminality — was not sufficiently "extreme and outrageous."

The arbitrator ordered claimants to pay almost $5 million to FreedomRoads for failing to repay its loan, and awarded respondents roughly $9 million in aggregate attorney's fees and costs. The arbitrator paused to note, as do we, the seemingly "remarkably high" and "extraordinary" nature of the fees and costs incurred in arbitration. The arbitrator, however, carefully scrutinized the fees and costs sought, and that portion of the award is not on review.

The trial court denied claimants' petition to vacate the award and granted respondents' petition to confirm.

Claimants timely appeal. As they did in their petition to vacate, claimants assert respondents procured the arbitration award by undue means and that the award was tainted by bias. Neither assertion warrants vacatur of the award. Before addressing these matters, we deny claimants' request for judicial notice of New York arbitration documents involving the nonparty participants and Lemonis. They do not bear on the dispositive issues in this appeal. (*OneTaste Inc. v. Netflix, Inc.* (2025) 116

Cal.App.5th 174, 194 [denial of judicial notice proper for irrelevant and unnecessary documents].)

## II.

The arbitration award was not procured by undue means.

## A.

Claimants' assertion of undue means stems from respondents' entry into a confidential settlement agreement with 70 other participants on *The Profit* who could have been witnesses in favor of Tumbleweed and Weissmann. That agreement prevented these participants from assisting claimants absent a judicial order, and thus, assert claimants, suppressed relevant evidence of respondents' unlawful conduct. Claimants contend the settlement agreement and respondents' invocation of it during the arbitration constitute "undue means" meriting vacatur. (Code Civ. Proc., § 1286.2, subd. (a)(1) [vacatur available when arbitration award "procured by corruption, fraud or other undue means"].)

Some additional facts are necessary about the settlement agreement and claimants' efforts to secure testimony from the other show participants. Around March 2021, Weissmann met other business owners who had appeared on *The Profit* and similarly believed Lemonis had hurt, rather than revived, their businesses. Weissmann communicated with these nonparties up until they settled with respondents in late 2021. Claimants were not parties to that settlement, and Weissmann was unaware of its terms or how many participants were signatories. In 2023, two years later, Weissmann contacted the nonparties in anticipation of calling them as witnesses at the arbitration. Only two responded, and claimants included those two on their arbitration witness list.

7

Respondents moved in limine to exclude the nonparty participants' testimony due to relevancy concerns, as well as because the proposed witnesses had previously agreed not to "cooperate with the prosecution of claims by other persons" against respondents without a "judicial order." By testifying, respondents claimed, the witnesses would be in violation of their settlement agreements. Respondents also advised claimants' counsel that the witnesses who had responded were already liable for breaching the settlement agreement's terms, which included a $100,000 liquidated damages clause for each violative conversation. Respondents conceded, however, that the witnesses could testify if "legally compelled" to do so, because the settlement agreement allowed for testimony in compliance with a "judicial order."

Claimants opposed respondents' motion and, in the same filing, sought various forms of affirmative relief from the arbitrator regarding the settlement agreement they then believed bound "forty-some participants." (At some later point, claimants learned there were 70 settling participants.) Claimants asked the arbitrator to issue subpoenas for the two witnesses it had identified and to "right th[e] wrong" as to them, draw negative inferences against respondents, and publicly declare the settlement agreement could not and did not prevent nonparties from cooperating with claimants. One of the two witnesses, urged claimants, could shed light on another scenario where Lemonis had made false promises and taken over businesses featured on *The Profit*. The other witness would add to the evidence on the emotional distress claim.

At a hearing, claimants' counsel advised the arbitrator that the witnesses, given respondents' threats to enforce the

8

settlement agreement, would not appear absent an order declaring the settlement agreement's non-disparagement and liquidated damages clauses to be unenforceable. The arbitrator questioned whether she had authority, in the private and confidential arbitration, to issue a declaration of unenforceability for venues outside the arbitration. She asked whether such a declaration could effectively protect the witnesses from respondents' potential enforcement efforts, or whether such a declaration would offer only "cold comfort." The point of declaring the agreement invalid, argued claimants, would be to not lose the testimony of the two witnesses. Claimants wanted to submit subpoenas for those witnesses for the arbitrator's approval. Respondents argued the arbitrator should not make a global declaration about the settlement agreement, but agreed that if the arbitrator thought the witnesses would offer relevant testimony, she could subpoena them and they could testify. In closing, claimants asked the arbitrator to "rule one way or another whether Your Honor will issue subpoenas." The arbitrator warned any subpoenaed testimony would still be subject to relevancy considerations. The arbitrator otherwise stated she would issue a written ruling.

Although a written ruling did not follow, the arbitrator issued two subpoenas as claimants requested. Claimants, however, did not call those witnesses at the evidentiary hearing. Claimants did not press for any further ruling or action regarding the settlement agreements and other participants.

Moving to vacate before the trial court, claimants asserted the missing evidence could have established (1) respondents' pattern and practice of fraudulent activity, showing fraudulent intent, and (2) other participants' contemplation of suicide,

9

corroborating Weissmann's claim that Lemonis was capable of inflicting severe emotional distress. Claimants also argued the threat of liquidated damages prevented the unearthing of untold evidence from other participants that might have supported its case.

The trial court rejected claimants' assertion the arbitration award had been procured by undue means. On appeal, claimants renew their assertion that other participants could have helped show fraudulent intent, and they again argue that untold evidence was suppressed. Claimants also assert, as they did briefly in their reply seeking vacatur, that the absent witnesses might have testified that Lemonis took control of their businesses and thereby could have supported claimants' view that Lemonis owed a fiduciary duty. The trial court did not address claimants' reply-brief contention regarding control and only on appeal do claimants expressly tie it to the breach of fiduciary duty claim as opposed to, for instance, the fraudulent concealment claim the trial court did address.

**B.**

While judicial review of arbitration awards is "severely limited" (*Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 825 (*Pour Le Bebe*)), a court shall vacate an award if it "was procured by corruption, fraud or other undue means" (Code Civ. Proc., § 1286.2, subd. (a)(1)). "[C]ases suggest the term" undue means "refers to unfair conduct that ' " 'deprives either party of a fair and impartial hearing to [that party's] substantial prejudice.' " ' " (*Starr v. Mayhew* (2022) 83 Cal.App.5th 842, 856 (*Starr*).) Absent the trial court's resolution of disputed facts, our review is de novo. (*Valencia v. Mendoza* (2024) 103 Cal.App.5th

10

427, 442; *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1435.)

To streamline our analysis, we assume without deciding that respondents' conduct with respect to the settlement agreement constituted undue means.

Nevertheless, vacatur was inappropriate because claimants did not show undue means "procured" the arbitration award. (Code Civ. Proc., § 1286.2, subd. (a)(1).) Claimants bore the burden " 'to demonstrate a nexus between the award and the alleged undue means used to attain it.' " (*Starr*, *supra*, 83 Cal.App.5th at p. 857, italics omitted, quoting *Pour Le Bebe*, *supra*, 112 Cal.App.4th at p. 834.) This required a showing that undue means had a " 'substantial or pervasive' impact on the 'award,' " (*Pour Le Bebe*, at p. 833) or "materially affect[ed]" the ruling (*Starr*, at p. 857.)

Claimants have not met their burden. This is so because "[t]he arbitrator provided several independent grounds" untethered to the allegedly missing and suppressed testimony, and claimants have not challenged those aspects of the arbitrator's ruling. (*Starr*, *supra*, 83 Cal.App.5th at p. 857; see *ibid.* [the challenged award "would have remained the same regardless" of the alleged undue means]; *ECC Capital Corp. v. Manatt, Phelps & Phillips, LLP* (2017) 9 Cal.App.5th 885, 908 [award not procured by undue means when arbitrator provided "multiple, alternative grounds" for the arbitral decision].)

We address the relevant claims.

The arbitrator rejected the fraud, fraudulent inducement, and fraudulent concealment claims in part because claimants could not establish reasonable reliance on Lemonis's promises of a deal or statements about Lemonis's business acumen. (*Behnke*

11

*v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1453 [reasonable reliance an element of promissory fraud]; *Dhital v. Nissan North America, Inc.* (2022) 84 Cal.App.5th 828, 843 [same for fraudulent inducement]; *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1185 [fraudulent concealment requires showing of "justifiable reliance" on the representation arising from the concealment].)  The arbitrator further found that no real promise of a deal was made and that claimants had not shown the falsity of the supposedly inducing statements.  And, as to the fraudulent concealment claims, the arbitrator also concluded claimants had not shown concealment of any material fact.  Claimants have not discussed in their appellate briefing how the purportedly concealed testimony affects these findings, which independently resolve these claims and which are based not on subjective matters such as intent but on objective reasonableness and the veracity of statements.

The arbitrator rejected the breach of fiduciary duty claim on the ground that Lemonis did not obtain control of Tumbleweed while Weissmann retained control "in every practical way."  (See *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 246 [" '[t]he key factor in the existence of a fiduciary relationship lies in control by a person over the property of another' "].)  First, claimants did not properly assert to the trial court, let alone the arbitrator, that the suppressed testimony would have addressed these findings and the breach of fiduciary duty claim and so has forfeited the argument.  (*Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1052, fn. 7 [failure to raise until trial court reply]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 30 [failure to raise in arbitration]; *Cummings v. Future Nissan* (2005) 128

12

Cal.App.4th 321, 329 ["[A] party who knowingly participates in the arbitration process without disclosing a ground for declaring it invalid is properly cast into the outer darkness of forfeiture"].)

Regardless, claimants have not explained how Lemonis's conduct regarding other businesses undermines the arbitrator's conclusion, *with respect to Tumbleweed*, that Weissmann "remained in control of the company in every practical way," ran the company on a day-to-day basis, "exercised unchecked discretion in managing sales, marketing, manufacturing, the production floor, and deciding which floor plans would be offered," "unilaterally terminated two of the most senior managers at Tumbleweed, and at all times . . . was Tumbleweed's CEO, sole board member, and sole shareholder." Claimants do not grapple with this evidence, instead focusing only on the arbitrator's finding that Lemonis's statement that he was "100% in charge" was a trademarked tag line used on all episodes of the show. This was insufficient.

As to the intentional infliction of emotional distress claim, the suppressed witness testimony could not have reversed the arbitrator's rejection of the claim on statute of limitations grounds.

To the extent claimants assert an amorphous prejudice based on the hope that some other *The Profit* participant might have come forward to offer dispositive testimony on the alternative grounds for the arbitrator's ruling discussed above, that speculation does not meet claimants' burden. (*Starr*, *supra*, 83 Cal.App.5th at p. 858; *People v. Young* (2005) 34 Cal.4th 1149, 1170 [speculation insufficient to show prejudice].)

In sum, even if claimants had established respondents' conduct with respect to the confidential settlement agreement

13

constituted undue means, they have not shown that the arbitral award was "procured by" those means given the unchallenged, independent bases supporting the award.

## III.

Nor do claimants show an appearance of arbitral bias tainted the award.

We vacate an arbitration award when the arbitrator's misconduct substantially prejudices a party's rights.  (Code Civ. Proc., § 1286.2, subd. (a)(3).)  " 'Misconduct' in this context includes actions that create a reasonable impression of possible bias." (*FCM Investments, LLC v. Grove Pham, LLC* (2023) 96 Cal.App.5th 545, 553 (*FCM Investments*).)  "[T]he test is whether a hypothetical reasonable person (i.e., a disinterested, well-informed, thoughtful member of the public) would form *an impression of possible bias* on the part of the arbitrator." (*Id.* at p. 555.)  " ' "An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason." ' [Citation.]  The test is objective and fact-specific; there is no bright-line demarcation for the impression of bias, and each case must be considered in light of the particular facts involved." (*Ibid.*)  We review "the award as a whole." (*Id.* at p. 558.) Claimants, as the parties seeking vacatur, bear the burden of proof.  (*Id.* at p. 555.)

Claimants proffer three arguments on appeal regarding bias.  We decline to address a fourth argument, which claimants made for the first time in reply, that an impression of bias can be found in the arbitrator's ruling on the breach of fiduciary duty claim.  (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 255 [" ' "[I]t is axiomatic that arguments made for the first time

14

in a reply brief will not be entertained because of the unfairness to the other party" ' "]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. 10.)

Claimants first argue bias from the arbitrator failing to examine the confidential settlement agreement's terms. This created an appearance of bias, argue claimants, because it suggests the arbitrator either prematurely formed an opinion about the motion in limine or became predisposed to rule in respondents' favor. The record belies this contention.

The arbitrator considered the parties' briefing and held a hearing where she thoughtfully questioned counsel. She questioned her authority, in arbitration, to declare the settlement agreement unenforceable in a way that would bind other fora. Claimants' counsel agreed that such a ruling would not be directly binding on other fora. Respondents agreed testimony from the two absent witnesses would not violate the agreement if they were subpoenaed, and the arbitrator issued subpoenas for those witnesses. It is not clear, as respondents point out, what relevance the agreement would have had at that point given the issues that had, by then, been raised and resolved. Of note, claimants did not later ask the arbitrator to memorialize or make further rulings on the matter. Claimants have not shown how a hypothetical observer would view this sequence of events and the ruling partially *in favor* of claimants as creating an impression of bias *against* them. And a claim of bias is not the proper vehicle to rehash the merits of a decision. (See *Betz v. Pankow* (1993) 16 Cal.App.4th 919, 927; *Dietrich v. Litton Industries, Inc.* (1970) 12 Cal.App.3d 704, 719.)

Second, claimants contend the arbitrator displayed bias when she created a Catch-22 scenario by issuing the subpoenas

15

without entering an order that the settlement agreement's non-disparagement clause was unenforceable. Since the subpoenas only protected the witnesses while testifying, assert claimants, the witnesses would have been in breach of the settlement agreement for any pre-hearing preparation. Accordingly, the arbitrator's decision, so the argument goes, forced claimants' counsel to either forego calling the witnesses or commit malpractice by calling them without having the opportunity to prepare them in advance. But at the hearing on the motion in limine, counsel for respondents gave an apparent assurance that a subpoena from the arbitrator would fall outside the non-disclosure provision. Claimants never took issue with that and appeared ready to proceed with the subpoenas. They did not, as noted, seek any further orders on this matter and proceeded to the evidentiary hearing. There was no appearance of bias from the arbitrator issuing the subpoenas, at claimants' request, as she did.

Third, claimants contend bias can be seen in the arbitrator's failure to provide a written ruling on the motion in limine. They argue that by failing to rule, the arbitrator allowed the settlement agreement to persist and the asserted witness threats to go unchallenged. However, the arbitrator provided a reasoned statement as to her belief that she was unable to bind other fora with a ruling that the settlement agreement was unenforceable; respondents represented that testifying pursuant to a subpoena would not constitute a breach of the agreement; and the arbitrator issued the requested subpoenas, which both ensured the witnesses could testify and seemingly protected them from breaching the settlement agreement. Failing to provide a further written ruling on respondents' motion does not reflect

16

bias.  To the extent any further ruling was needed, claimants'
view of the absent ruling would turn a familiar guideline of
appellate review on its head.  If a litigant "does not secure a
ruling, [the litigant] does not preserve the point.  That is the rule.
No exception is available."  (*People v. Rowland* (1992) 4 Cal.4th
238, 259.)

We further highlight the record reveals the arbitrator
conducted a seven-day hearing, thoughtfully considered the
parties' arguments, and provided an extensive and thorough
written award.  Claimants have not made the requisite showing
of an impression of bias necessitating vacatur.

**DISPOSITION**

We affirm the judgment and award respondents their
appellate costs.


SCHERB, J.


We concur:


STRATTON, P. J.



VIRAMONTES, J.

17